## In Re ALBERTA ANTOINETTE INGENBOHS.

**Springfield Court of Appeals, July 28, 1913.**

1. **MINORS: Guardian For: Probate Court Authority to Appoint, When.** No authority is given the Court of Appeals to appoint a guardian for a minor, but a probate court has such authority. Before the probate court can exercise such authority it must find that the minor's residence is in the county and also that the minor's father is not competent and fit for the duties of guardianship.

2. **———: Custody of: Habeas Corpus.** The Court of Appeals has authority in *habeas corpus* proceedings to hear and determine who shall have the custody of a minor child.

3. **COURTS: Jurisdiction: Not to Conflict.** Where the jurisdiction of a court and the right of the plaintiff to prosecute his suit in it have once attached, that right cannot be arrested and taken away by proceedings in another court.

4. **———: Habeas Corpus: Minors: Questions Involved.** In a *habeas corpus* proceeding by a father to obtain the custody of his child, the questions of the fitness of the father for the guardianship of the child and the place of the child's domicile

being directly involved, *held* that the right of the Court of appeals to determine those issues could not be impaired, abridged or interfered with by the probate court in a guardianship proceeding instituted therein after the appellate court had acquired jurisdiction in the *habeas corpus* proceedings.

5. **HABEAS CORPUS: Custody of Child: Evidence Reviewed.** In a *habeas corpus* proceeding by a father to obtain the custody of his minor child, the evidence is examined and reviewed and *held* not sufficient to show that the petitioner had given and abandoned the child to its maternal grandmother.

6. **PARENT AND CHILD: Parent Proper Custodian: Child's Interests.** The law presumes that it is to the best interest of the child to be in the custody of its parent.

7. **——: Custody Given to Another by Mother: Death Revokes Gift.** Even though a mother before her death did give a minor child to its maternal grandmother, such gift was revoked at the mother's death and the father's right to the custody of the child was not thereafter affected by such gift.

8. **——: Custody of Child: Father Contracting Away: Habeas Corpus.** A father cannot by contract, other than such as provided by statute, confer upon another irrevocably and absolutely as against himself, a right to the custody of his minor child. And notwithstanding such a contract, upon *habeas corpus* for the custody of such child, the custody will be awarded to the father unless the welfare of the child demands some other disposition be made of it.

9. **——: Custody of Child: Parent Natural Guardian.** The father, after the death of the mother, is the natural guardian of his minor child. And it is only when he fails to care for and protect it and when the child's best interest demands it, that the court will award the custody to others more competent and proper to look after and care for it.

10. **HABEAS CORPUS: Custody of Child: Parent Natural Guardian.** In a *habeas corpus* proceeding by a father to obtain the custody of his minor child from its maternal grandmother, to whom the child had been given by the mother at her death, the evidence showed that the father was a young man of exemplary character and excellent habits, having steady and honorable employment at a good salary and that he had made provision for a suitable home for the child. *Held*, that the father was fit and competent for the duties of guardianship of the child and that the child's interests and future welfare would be best subserved by giving its care and custody to the father.

Habeas Corpus—Original Proceeding.

WRIT AWARDED.

*Lehmann & Lehman* of St. Louis for petitioner.

*W. Cloud* of Pierce City for respondents.

FARRINGTON, J.—On March 7, 1913, there was filed in this court a petition by George Ingenbohs, the father of Alberta Antoinette Ingenbohs, for a writ of *habeas corpus,* the purpose being to obtain the custody of his said daughter, an infant, alleging that it was wrongfully and illegally withheld by the respondents, Catherine Conley and Bernard Conley, its maternal grandparents. The writ was issued on March 13, 1913.

Respondents in due time made their return, alleging that the child had been given to them by its father, the petitioner, on the occasion of the death of the child's mother which occurred at respondents' home, and that the father "abandoned to the respondents" this child; that the petitioner is "incompetent and unfit personally to care for his child;" and that on March 31, 1913, the probate court of Barry county (where respondents reside and keep the child) "ordered and adjudged that the petitioner is incompetent and unfit for the guardianship of his child and appointed respondent Catherine Conley its guardian."

The reply denies the gift or abandonment, denies that petitioner is incompetent or unfit to care for his child, denies that Catherine Conley is the legally appointed guardian of the child, and alleges that petitioner has filed a petition for a writ of prohibition in this court, docketed as cause number 1064, to be directed to the judge of the probate court of Barry county the object of which is to prohibit said officer from proceeding further concerning the custody of said child.

This court made an order appointing Honorable E. A. Barbour of the Springfield bar as special commissioner to hear the testimony in the cause and to report his finding of facts and conclusions of law thereon to this court, which he did in proper time. It appears from his report that forty-three witnesses were examined, some of them in St. Louis where the petitioner resides, and the others in Monett where respondents reside. The detailed finding of the facts made by the special commissioner need not be set forth in this, the, report of the case. The commissioner's final conclusions upon the facts and the law adequately present every phase of the case, and that portion of his report is as follows:

"As shown by the pleadings, this is a contest between the father of the infant in question, on the one side, and its grandparents, on its mother's side, on the other.

"Upon the issues joined and under the findings of fact, three questions arise, to each of which, separately, the law will be applied as found by your commissioner, to-wit:

"1st. It is contended by respondents that the appointment of Mrs. Conley as guardian of this child by the probate court takes away the right of this court to determine the rights of the parties in the *habeas corpus* proceeding. On the other hand, petitioner contends that this court first had complete jurisdiction of the parties and the subject-matter involved, and that therefore (and for other reasons) the probate court was without jurisdiction in the premises at the time it acted.

"2nd. As to whether or not Mrs. Conley acquired any exclusive right to the care and custody of this child, by reason of what occurred at the bedside of petitioner's wife, shortly prior to her death, and his actions subsequent to her death.

"3rd. Should the care and custody of this infant child be given to the petitioner, its father, or to the respondents, its grandparents.

"Of these in their order.

"I. It must be conceded that the *habeas corpus* petition had been filed in this court and the writ had been issued and personally served on each of the respondents before any steps at all were taken in the probate court looking to the appointment of a guardian for the infant child involved in this action. These facts were known to the probate judge and to respondents' attorney before the inquiry was held and before the appointment of the guardian was made. It is true that this court has no authority to appoint a guardian for a minor. It is also true that the probate court does have authority to appoint such guardian, when its jurisdiction in that regard is properly and legally exercised. It is also unquestionably true that the Court of Appeals has authority, in *habeas corpus* proceedings, to hear and determine who shall have the custody of a minor child, such as the one involved in this controversy. [Edwards v. Edwards, 84 Mo. App. 552; Brewer v. Cary, 148 Mo. App. 193, 1. c. 208 and 215; Orey v. Moller, 142 Mo. App. 579; In Re Boutelle, 124 Mo. App. 450.]

"Before the probate court would have any right to appoint Mrs. Conley as guardian of this child, even when no question of jurisdiction, or regularity of its proceedings, is involved, that court must first find that the child's domicile is in Barry county, and that its father is incompetent and unfit for the duties of guardianship. The determination of those very questions, between the same parties, in order to ascertain who is the proper custodian of this same child, is directly involved in this *habeas corpus* proceeding, and the right of this court to determine those issues cannot be impaired, abridged or interfered with by the probate court in the guardianship proceeding instituted therein, *after* this court had

acquired jurisdiction in this proceeding. I therefore hold that this court first acquired jurisdiction to determine the proper custodian of the child in question, and that its right to now determine that question has not, in any way, been impaired or curtailed by the action of the probate court of Barry county in the appointment of Mrs. Conley as guardian for petitioner's child. To hold otherwise would be to hold that after an appellate court in this State had acquired jurisdiction in an *habeas corpus* proceeding involving the right to determine the custody of a minor child, its right to act, unless it acted very speedily, could be taken away and entirely destroyed, simply by having a probate court appoint a guardian for the child. Plainly such cannot be the law. In support of these conclusions I refer to the following authorities: State ex rel. Evans v. Broaddus, 245 Mo. 123; Peck v. Jenness, 7 How. 612, 12 L. Ed. 841; Seibel v. Simeon, 62 Mo. 255; In Re Gladys Morgan, 117 Mo. 249; State ex rel. Merriam v. Ross, 122 Mo. 435, 462; 11 Cyc. 985, citing numerous cases.

"In State ex rel. Evans v. Broaddus, supra, a witness was committed by a notary public for refusing to answer questions at the taking of his deposition. Warrant of commitment was placed in the hands of the sheriff to whom the witness surrendered, and on the same day he filed in the circuit court his petition for a writ of *habeas corpus*. Some twelve days later the circuit judge issued the writ, the sheriff made his return, the court took the matter under advisement, and there it rested. Four days before the writ was issued, the plaintiff in the case out of which the commitment arose applied to the Kansas City Court of Appeals and obtained a writ of mandamus directing the sheriff to execute the notary's warrant of commitment, notwithstanding the pendency of the *habeas corpus* proceeding in the circuit court. Thereupon the witness took the whole record to the Supreme Court on *certiorari*. In a

lengthy, exhaustive and unanimous opinion the court *in banc* held that the circuit court in the *habeas corpus* proceeding had sole jurisdiction to dispose of the case, and the judgment of the Kansas City Court of Appeals was quashed.

"In Peck v. Jenness, supra, in disposing of conflicting jurisdiction the court uses this language:   'It is a doctrine of law too long established to require a citation of authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause,   .   .   .;   and that, where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court.   These rules have their foundation, not merely in comity, but on necessity.   .   .   .   Neither can one take property from the custody of the other by replevin or any other process.   .   .   .   An attempt to enforce the decree set forth in the rejoinder would probably have been met with resistance, and resulted in a collision of jurisdictions much to be deprecated.'

"This last case is cited and quoted from in Seibel v. Simeon, supra, in which, after citing a number of cases, Judge SHERWOOD says:   'These cases announce the familiar doctrine "that where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested and taken away by proceedings in any other court.' "

"In Re Gladys Morgan, supra:   This was an original proceeding by *habeas corpus* in the Supreme Court whereby the wife sought to obtain possession of her minor child, then in the custody of its father who was her husband.   At the time this petition was filed in the Supreme Court, divorce proceedings were pending in the circuit court of St. Louis at the instance of the wife against the husband, but the custody of this child was not asked for by either of the parties.

The Supreme Court held that the circuit court alone had jurisdiction of the parties and subject-matter of the suit, and had the right to determine the custody of the child in question, and for that reason denied the writ and dismissed the *habeas corpus* proceeding.

"In State ex rel. Sullivan v. Reynolds, 209 Mo. 161, the Supreme Court *in banc* fully discusses this question of conflict .of jurisdiction and clearly holds that the jurisdiction is lodged in that court which first acquires it.

"II.  It is next contended by respondents that this child in question was given to Mrs. Conley prior to the death of its mother, and that thereafter the father abandoned its care and custody to her, and that, for those alleged reasons, she acquired the right to hold the child as against the claims of its father, the petitioner herein.

"The evidence shows that shortly before her death, the mother of this babe requested her husband, the petitioner, to give the baby to its grandmother, or, to leave it with its grandmother, and that he promised to do so.  The evidence is not very clear as to just what was said and is conflicting.  The petitioner states that he made this promise to his wife on her deathbed, on condition that Mrs. Conley would bring the child up right, speaking good to her of her father, and that there would be no disagreements between himself and Mrs. Conley.  The witnesses for respondents. do not agree that these conditions accompanied his promise to his wife.  At most, it was a verbal promise to his wife that he would give the baby to its grandmother, or that he would leave it with her.  It is not even shown that the dying wife gave her babe to its grandmother, although it is clear that she desired her husband to make that disposition of the child.  She evidently realized that after her death the disposition of the child would be in the hands of its father.  On the other hand,

it is made perfectly clear by the evidence that the father never executed any writing relinquishing his right to the care and custody of this child. Mrs. Conley requested him to do so and he flatly refused. So much for the transfer of his right to the future care and custody of his child.

"Petitioner's wife died August 14, 1912, and after her burial he returned to his home and employment in St. Louis, leaving the child with its grandmother, Mrs. Conley. But before leaving he arranged to pay to Mrs. Conley the sum of $250 and to release to her his claims on a certain piano, in consideration of the care and attention she had given his wife and child during the sickness of the wife. At the same time he agreed to pay Mrs. Conley twenty dollars each month for the future care of the child. This amount he sent to her in September, October and November. In November petitioner went to Pierce City and remained four days, during which time he visited his child a number of times and made an effort to effect a settlement of the $250 item with Mrs. Conley, but the effort failed. Thereafter, their relations became strained, correspondence between them ceased, and he discontinued sending her the monthly allowance of twenty dollars. At Christmas he and members of his family sent presents to the baby from St. Louis, the receipt of which was not acknowledged. He had buried his wife on the Conley lot at Mrs. Conley's request. He had purchased a stone to be placed at her grave, but Mrs. Conley would not allow it to be set on her lot until the $250 matter was settled. With these conditions existing Mrs. Conley went to St. Louis in January and after another fruitless effort to adjust their money differences, petitioner demanded his child from her.

"I hold that the evidence wholly fails to show that the petitioner gave and abandoned to respondent, Catherine Conley, the care and custody of his child here in question. And even if the mother did give the

child to her before she died, that gift stood revoked at her death and the father's right to the child thereafter was not affected by such gift.    These conclusions are clearly justified by the following authorities: De Jarnett v. Harper, 45 Mo. App. 415; In the Matter of Berenice Scarritt, 76 Mo. 565, l. c. 582; Weir v. Marley, 99 Mo. 484, l. c. 494-496; Smith v. Young, 136 Mo. App. 65, l. c. 76-77; Brewer v. Cary, 148 Mo. App. 193, l. c. 213.

"In De Jarnett v. Harper, supra, in passing upon the guardianship of Richard Harper, minor son of J. P. and Mary M. Harper, the court at page 420, says: 'But it is claimed that, before the father, James P. Harper, died, he gave the custody of this child into the keeping of the defendant, then living in Johnson county, and that by reason thereof its domicile had been changed.    Even admitting the force of this contention, such a disposition of the infant had no effect beyond the period of the father's life.    At the death of James P. Harper, his wife, Mary M., became entitled to the custody, and was bound for the maintenance and support, of her minor child.    She was, on the death of her husband, the natural guardian of the child, and entitled to its care, custody and control.    [R. S. 1889, sec. 5279.]    This right of the surviving mother was inalienable by any such agreement or conduct of the father as is here relied on.    It   was revocable during the life of the father, and stood as revoked absolutely at his death.    [In the Matter of Berenice Scarritt, 76 Mo. 584; Weir v. Marley, 99 Mo. 484; In re Blackburn, 41 Mo. App. 622.]

"In re Berenice Scarritt, supra: This is an *habeas corpus* proceeding in which petitioner seeks to obtain the custody of his minor daughter from its grandparents into whose custody it passed at the death of its mother.    In their return respondents claimed the right to the custody of the child by authority of its dying mother, and upon the further authority of a written

request and contract made by the child's father, etc. In this case the father permitted his child to remain with its grandparents after the death of his wife, and a letter to the grandmother committed the custody of the child to her. The court held that even if this letter be construed to be a contract, for a consideration, yet it would be void, as against public policy. In declaring the law on this question the court at page 584 uses this language: 'As to any mere article of property, either personal or real, the law permits a man to dispose of it, by gift or contract, as he chooses. Not so of his children. The father owes a duty to nurture, support, educate and protect his child, and the child has the right to call on him for the discharge of this duty. These obligations and rights are imposed and conferred by the laws of nature; and public policy, for the good of society, will not permit or allow the father to irrevocably divest himself of or to abandon them at his mere will or pleasure.'

"The case of Weir v. Marley, supra, is one of the leading cases in this State, and in many respects, its facts are quite similar to those in the case at bar. In that case the grandparents sought to obtain the custody of a minor child from its father, basing their right of custody on the fact that its mother (their daughter) on her deathbed gave the child to its grandmother, and that the husband consented and concurred in such gift. The court held that the grandparents acquired no right to the custody of the child under the gift. The court clearly lays down the rule that the law presumes that it is to the interest of the minor child to be in the custody of its parent. The court at pages 494-495, speaking of the father's custody of his minor child, then says: 'He cannot deprive himself of this right of custody, which is the concomitant of a personal trust imposed upon him by the law of nature, as well as by positive law, and essential to the discharge of the duties of that trust, by contract *per se*, otherwise he might

deprive his child and society of the benefits which the
law contemplates will inure to each by the personal
discharge of his parental duties. An analysis of the
many cases to which we have been cited by counsel
serves only to confirm in our judgment the correctness
of the ruling of this court in the case of Berenice Scarritt,
76 Mo. 565. That a father cannot by contract, other
than such as are provided for by statute, confer upon
another irrevocably and absolutely as against himself
a right to the custody of his minor child; that notwith-
standing any such contract, upon *habeas corpus* for the
custody of such child, the custody will be awarded to
the father, unless the welfare of the child demands that
it should remain in, or be restored to, the custody of
the person with whom it was placed by the father un-
der such contract, or that some other disposition be
made of it.'

"In the case of Smith v. Young, supra, in passing
on a contract for the future custody of a minor child,
the court at page 75, says: 'Now it appears that the
minor in the present instance was placed in the home
of her grandfather in Pike county when only three days
of age; and this, too, under an agreement on the part
of the father that the grandparents should retain her
ever after. It is true this agreement was not obliga-
tory on the part of the father as a matter of law. It
was revocable at will on his part. [In re Scarritt, 76
Mo. 595.] And there is no doubt had the father died
and the mother survived, the death of the father would
have operated as a revocation of the promise, and,
*ipso facto*, transferred the domicile of the infant to
that of the surviving mother. [De Jarnett v. Harper,
45 Mo. App. 415.]'

"III. In this case the petitioner is seeking to
enforce his natural rights as the father of his infant
child. After the death of the mother, the father is the
natural guardian of his minor child and the law imposes

on him, and on him alone, the absolute duty of caring for and protecting it. The laws of the land, public policy and the interests of society, as well as the interest of the helpless child, demand this of him and he cannot escape the burden, nor can he shift it to other shoulders and thus rid himself of it. It is only when he proves himself recreant to this sacred trust, and when, for that reason, the interest of his infant child so demands, will the court step in and displace the laws of nature by awarding the custody to others more competent and willing than he to administer to the wants and needs of his helpless child. The relation of father and child is too sacred to be lightly shattered, and no court will disturb it unless the interest of the weaker one clearly demands it. It cannot be ignored that the father and child are bound together by ties that in their nature are nearer and stronger than it is possible for any relative in a remoter degree to feel or experience. The above conclusions are so clearly upheld by two leading cases in this State that I take the liberty of quoting from them as follows: In re Scarritt, supra, l. c. 582:

" 'As shown by the pleadings, this is a contest between the father of the infant in question, on the one side, and its grandparents, on its mother's side, on the other.

" 'There is but little, if any, dispute, between the parties as to the law generally applicable to such contests. It is conceded that the father is the natural guardian of his child, and as such entitled to the custody of its person. It is also conceded that in contests of this sort it is the duty of the court to award the person of the infant to the custody of the father, unless it is made manifest to the court that the father, for some reason, is unfit or incompetent to take charge of it; or unless the welfare of the child itself, for some special or extraordinary reason, demands a different dis-

173 Mo. App. 18

position of it, at the hands of the court. Such appears to be the language and current of authorities, to which we have been cited, or to which we have had access. Indeed, this is the admitted law. About this there is no controversy. It is also conceded that the father, by the common law, cannot irrevocably divest himself, even by contract with the mother, or any other person, of the custody of his children. It is held, both in England and in this country, that an agreement by which the father surrenders the custody of his child, is not binding; and that he is at liberty to revoke his consent afterwards and obtain the child by writ of *habeas corpus*. In some of the States, under special circumstances, it has been held otherwise, but such is the manifest current of authorities, in this country, as well as in England.'

"And again in Weir v. Marley, supra, l. c. 494, the court says: 'In all civilized countries, in which the family is regarded as the unit of social organization, its minor members must and ought to be subject to the custody and control of those who are immediately responsible for their being, for the reason that by nature there has been implanted in the human heart those seeds of parental and filial affection that will assure to the infant care and protection in the years of its helplessness, to be returned to the parents again when they in their turn may need protection, in their years of helplessness and of their child's strength and maturity. The law, at the birth of an infant, imposes upon the parent the duty of such care and protection, to the performance of which the instincts of nature so readily prompt, and clothe him with the right of custody, that he may perform it effectually, upon the presumption that such custody, being in harmony with nature, is best for the interest, not only of the parent and child, but also of society. . . . .'

"The reasoning in the above cases is so clear and convincing and the conclusions reached therein have

so often been approved and followed that further citation of authority would be useless.

"Applying the doctrine of these cases to the facts in this case at bar, I am forced to conclude that the petitioner is entitled to have the future care and custody of his child in controversy. The evidence clearly shows that he is a young man of exemplary character, and of excellent habits, and that for a number of years he has been steadily and regularly engaged at honorable employment, all the while earning a good salary. That during his married life he and his wife lived happily, and that he made suitable provision for her comfort and needs. Some complaint is made by respondents that since his wife's death he has not shown proper interest in his child. Shortly after his wife's death he visited his child at Pierce City and subsequently made proper inquiries about it and sent it presents. It must not be overlooked that his child was kept by the grandmother some 287 miles distant from petitioner's home in St. Louis where he was employed. Under such circumstances frequent visits to the child would entail upon him much expense and loss of time from his work. In addition to this, it is clear that petitioner did not feel he was welcome in the Conley home after his visit in November. The evidence shows that he was justified in entertaining that feeling. It is evident that petitioner is possessed of a strong and sincere desire to have his child with him at his home in St. Louis, where he can be near it and have the pleasure and comfort of its constant presence and association. It is a perfectly natural and laudable desire on his part, and in order to gratify it and provide for the comfort and needs of his child he has made adequate provision for a suitable home where he and the child can dwell together in peace and quiet. Under all the evidence I am convinced that the petitioner is fit and competent for the duties of guardianship of his minor child and that its

best interest and future welfare will be best subserved by giving to him its care and custody.

"Upon the law as found, and upon the facts as found, I therefore find and conclude that the child in controversy should be surrendered by the respondents and that its future care and custody should be awarded to its father, George Ingenbohs, the petitioner herein."

After reading the testimony of all the witnesses and examining all the exhibits filed therewith, we are thoroughly convinced that the learned commissioner reached the correct and proper conclusion, and we therefore adopt his report as the opinion of this court. It is accordingly ordered that the custody of Alberta Antoinette Ingenbohs be at once awarded to the petitioner, George Ingenbohs.    All concur.